**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**SHMUEL M. GOLDENBERG,**

Plaintiff,

*~ against ~*

**REFOEL SILBERBERG, also known as RAFI SILBERBERG***;*
**MEIR SHULEM GERTNER, also known as MAYER SHALOM GERTNER***;*
**AVRAHAM KAHAN, also known as AVI KAHAN***; and*
**JOHN DOES 1 through 10,**

Defendants.

Case No. 7:26-cv-09285

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Shmuel M. Goldenberg, by his attorneys, Gottesman Legal PLLC, for his Complaint against the Defendants, alleges as follows. Allegations about Plaintiff's own acts, statements made to him, and events he witnessed are made on personal knowledge. All other allegations are made on information and belief, and the source of that information is identified where the allegation is made.

## NATURE OF THE ACTION

1. This is a civil-rights action for money damages against three private individuals who held themselves out as able to "fix" the outcome of Plaintiff's matrimonial and custody case in the Supreme Court of the State of New York, Rockland County, through the Justice presiding over it.

2. Defendants demanded that Plaintiff and his family pay for that outcome, including a cash payment for the Justice. They threatened that if the price was not paid the court would order Plaintiff's arrest.

3. Plaintiff refused to pay.

4. Days later, the custody and support trials in his matrimonial case went forward in his absence.

5. This action does not ask this Court to review, vacate or modify any order or judgment of the State Court at this time. Plaintiff's challenge to the state court's judgment is pending before the state court on his own motion, and nothing in this Complaint asks this Court to decide it.

6. This action independently seeks damages from private persons for their own conduct in conspiring with a state judicial officer to deprive Plaintiff of due process of law, under 42 U.S.C. § 1983.

**THE PARTIES**

7. Plaintiff Shmuel M. Goldenberg ("Plaintiff") is a natural person domiciled in Forty Fort in the County of Luzerne in the Commonwealth of Pennsylvania.

8. He is the father of two daughters: an older adult daughter and a younger daughter, who is now a minor and is referred to in this Complaint as "the Child."

9. Defendant Refoel Silberberg, also known as Rafi Silberberg ("Silberberg"), is a natural person who resides at Spring Valley in the Countyof Rockland in the State of New York.

10. Since 2021, Silberberg has held staff positions with an elected official who was then a member of the New York State Assembly and is now a Member of the United States House of Representatives. Silberberg currently serves as that Member's Deputy Chief of Staff. He held himself out to Plaintiff as a person with influence over public officials and over the outcome of cases in the Rockland County courts.

11. Defendant Meir Shulem Gertner, also known as Mayer Shalom Gertner ("Gertner"), is a natural person who resides at Monsey in the County of Rockland in the State of New York 10952.

12. Gertner holds himself out as a community leader who works between community leaders and politicians during local elections.

13. Defendant Avraham Kahan, also known as Avi Kahan ("Kahan"), is a natural person who resides at Suffern in the County of Rockland in the State of New York 10901. His office where he conducts business is also at Suffern in Rockland County.

14. Defendants John Does 1 through 10 are persons whose identities are not yet known to Plaintiff who joined in the conduct described in this Complaint, including persons who attended the meetings described in Part E below and persons who acted as intermediaries between the named Defendants and the state court. Plaintiff will seek leave to amend this Complaint to name them when their identities are learned.

15. Non-OParty The Honorable Sherri L. Eisenpress ("Justice Eisenpress") was, until she left the bench in 2026, a Justice of the Supreme Court of the State of New York, Rockland County, and presided over Plaintiff's matrimonial action from late 2022 through 2024.

16. Justice Eisenpress is not named as a defendant at this time. Under *Dennis v. Sparks*, 449 U.S. 24 (1980), private persons who conspire with a judge act under color of state law even though in a situation where the judge may be immune.

**<u>JURISDICTION AND VENUE</u>**

17. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3), because this action arises under 42 U.S.C. § 1983.

18. This Court has personal jurisdiction over each Defendant because each resides in the State of New York and because the conduct described in this Complaint took place in New York.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), because all named Defendants reside in this District, and under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claim occurred in Rockland County, New York.

20. Because the claim arose in Rockland County, this action is properly assigned to the White Plains courthouse under Rule 18 of this Court's Rules for the Division of Business Among District Judges.

## FACTUAL ALLEGATIONS

### A. The matrimonial action

21. Plaintiff and his former wife, Pearl R. Goldenberg ("Pearl"), were married and lived with their two daughters in Airmont in County of Rockland in the State of New York.

22. In July 2022, Plaintiff commenced an action for divorce in the Supreme Court of the State of New York, Rockland County, captioned *Goldenberg v. Goldenberg*, Index No. 032839/2022 (the "Matrimonial Action"). In September 2022, Pearl answered and counterclaimed.

23. In November 2022, on Pearl's application, an order of protection was issued that removed Plaintiff from the family home. The Matrimonial Action was assigned to Justice Eisenpress. It remained before her through 2024.

24. The issues over which Justice Eisenpress presided included custody of and visitation with the children, child support, and the disposition of the family home.

25. In 2023, Plaintiff moved to Forty Fort, Pennsylvania, where he has lived since. In October 2023, Plaintiff's father, Leon Goldenberg, was diagnosed with stage 4 cancer. Plaintiff's father died in 2026, a detail whose relevance will become apparent later.

**B. Kahan and the arranging of outcomes in the Rockland County courts**

26. Kahan operates a group of organizations from Suffern in the County of Rockland in the State of New York. This includes: "The Derech Shalom Center" ("DSC").

27. Kahan holds out as DSC as a community organization devoted to peacemaking and mediation. A supervised-visitation provider that serves Rockland County custody cases, the Rockland Youth Empowerment Center ("RYE"), operates from the same office building as DSC and upon information and belief collaborates with them.

28. Upon information and belief, part of Kahan's business is (for pay) to "arrange" the outcome of matrimonial, custody and related cases in the Rockland County courts.

29. Upon information and belief, Kahan charges litigants who engage him an "organizational fee" of between $5,000 and $10,000 per motion. Plaintiff's information comes from another Rockland County litigant who paid Kahan such a fee and described it to Plaintiff directly.

30. Gertner identifies Marks that he introduces to Silberberg. Silberberg then brings those litigants to Kahan. That's what happened to Plaintiff.

31. Gertner, through his standing in the community, identifies litigants in distress and introduces them to Silberberg. Silberberg, who holds himself out as a person who can influence judges and officials, steers the litigant to attorneys of his choosing and negotiates the litigant's terms with Kahan.

**C. The approach to Plaintiff**

32. Gertner, a longtime acquaintance of the Goldenberg family, met with Plaintiff about the Matrimonial Action on several occasions beginning in or about August 2023.

33. In or about October 2023, after Plaintiff's father had been diagnosed with cancer, Gertner contacted Plaintiff's father and Plaintiff's brother, Yoel Goldenberg, also known as Jack Goldenberg ("Yoel"). Gertner said that he had learned of the family's troubles, that he was "well connected in the community" because he worked between community leaders and politicians during elections. He expressed a willingness to help the Plaintiff in the Matrimonial Action.

34. Plaintiff's father urged Plaintiff to meet Gertner again. In or about late October 2023, Plaintiff met Gertner at Gertner's home in Monsey and described the Matrimonial Action to him in detail.

35. Gertner told Plaintiff that he knew Silberberg "very well," described Silberberg's position on the staff of a Member of Congress, and said that Silberberg was in a position to help. Gertner arranged for Plaintiff to meet Silberberg.

36. Shortly afterward, at Gertner's home, Plaintiff met Silberberg for the first time. Plaintiff told Silberberg that he wanted the Matrimonial Action resolved peacefully through mediation or a rabbinical court, and asked whether Silberberg could get the case out of court. Silberberg said that he would come back to Plaintiff in about a week with a plan.

37. Within the following month or two, Silberberg sent Plaintiff a message with the names of three attorneys and told Plaintiff to choose one of them as his new counsel in the Matrimonial Action.

38. Plaintiff did not retain any of those lawyers.

39. In or about December 2023, Plaintiff met Silberberg again, at Silberberg's home. Plaintiff asked how the court could be so hostile to him when he was trying to resolve the case peacefully, and whether anyone was "pulling strings." Silberberg asked whether Plaintiff had heard of Avi Kahan and whether Kahan was involved. Silberberg said that he knew Kahan well and offered, with Plaintiff's permission, to speak with Kahan about the case. Plaintiff agreed on one condition: Silberberg was to make no deal, only to find out what Kahan knew.

40. A few days later, at Silberberg's home, Silberberg told Plaintiff that Kahan had said that he had been "involved in the case from the beginning," that he had been hired and paid by a person associated with Pearl, and that he wanted Plaintiff to come to Kahan's office to "discuss" the case.

41. Plaintiff refused to meet Kahan and asked why Silberberg could not help him directly. Silberberg answered that "they" had a deal between themselves that whoever first became involved in a case remained in charge of it, that Kahan had been involved first, and that the Matrimonial Action therefore had to remain Kahan's case. Silberberg again told Plaintiff to retain one of the three attorneys he had named.

42. Plaintiff told Silberberg that he would settle the Matrimonial Action only if it were moved out of court to a neutral rabbinical court or neutral mediation without any involvement by Kahan, that he wanted no part of what he called a "court fixing scheme." He indicated that if the unlawful campaign against him did not stop he would pursue every legal avenue available to him.

43. Between December 2023 and February 2024, Plaintiff met with another Rockland County litigant who described similar conduct in his own case, and with that litigant's

attorney, who was in communication with the Federal Bureau of Investigation about that conduct. Plaintiff described to them what Silberberg and Gertner had told him.

**D. The Demand**

44. Justice Eisenpress set the custody trial in the Matrimonial Action for March 11, 2024, and the support trial for March 20, 2024.

45. Plaintiff's relationship with his attorneys ended in December 2023, and he was without counsel from then on. In early 2024, while caring for his gravely ill father, Plaintiff was told, through members of his family, that he would be arrested.

46. In or about mid-February 2024, about three weeks before the custody trial, Gertner contacted Plaintiff again. Gertner said that Plaintiff's father and Yoel had asked him what could be done to settle the Matrimonial Action, and that Silberberg had spoken to Kahan and that Kahan was "willing to work out a settlement."

47. That night, Plaintiff met Gertner at Gertner's home. Silberberg had been invited but did not attend; he remained involved and was kept informed of the discussions. Plaintiff repeated that he would participate only if the case were taken out of court, and gave them one week to show good faith by doing so. Gertner said that Plaintiff needed an attorney regardless and called an attorney, Devorah Beck ("Beck"), who arrived at Gertner's home at about 11:30 p.m. that night. Plaintiff described his case to her. Plaintiff never retained Beck, never authorized her to act for him, and never paid her.

48. Toward the end of that week, Gertner told Plaintiff that a meeting had been held at Yoel's place of business, attended by "many high-profile individuals," at which a deal had been proposed that required $50,000 to be paid to Silberberg to "facilitate" the deal.

49. Plaintiff refused. The case was not moved out of court.

50. Plaintiff told his family that he wanted no part of any such arrangement and that they were not to negotiate for him. After that, Gertner and Silberberg dealt with Plaintiff's family rather than with Plaintiff.

**E. The meetings at Yoel's place of business**

51. In late February and early March 2024, before the March 11, 2024 trial date, further meetings were held at Yoel's place of business in Rockland County, without Plaintiff's knowledge or consent. Plaintiff's father attended by video. In or about July or August 2024, Plaintiff's father described those meetings to Plaintiff, and to other members of the family, in Woodridge, New York. The allegations in this Part E are made on information and belief, on that basis.

52. The persons at those meetings included Gertner, Silberberg and Kahan, together with Yoel, Plaintiff's father by video, and other persons (among John Does 1 through 10).

53. At those meetings, Gertner, Silberberg and Kahan presented the following terms as the only means by which the Matrimonial Action could be ended:

(i.) Plaintiff's home would be transferred to Pearl;

(ii.) Plaintiff would pay Pearl an additional $300,000 toward future child support;

(iii.) Plaintiff would sign an admission that he was a molester, which would place him on the sex-offender registry;

(iv.) Plaintiff's visitation with the Child would remain limited to two hours per week, supervised, at RYE, as the court had ordered on January 11, 2024;

(v.) $50,000 would be paid to Kahan to pay Justice Eisenpress: $25,000 in cash, and $25,000 in payments to charitable organizations;

(vi.) an additional payment would be made to Silberberg;

(vii.) approximately $70,000 would be paid toward Pearl's legal fees; and

(viii.) a stipulation embodying these terms would be drafted by attorneys chosen by the Defendants, signed, and filed with the court so that no trial would be held.

54. Plaintiff's family was told at those meetings that if these terms were not accepted, Plaintiff would be arrested. During the same period, Gertner told Plaintiff's father and Yoel, and Kahan told Yoel at the meetings, that Plaintiff would be arrested for contempt if the terms were not accepted.

55. The terms were not a settlement proposal. They were the price of an outcome the Defendants undertook to deliver through the court: a cash payment for the Justice, payments for the intermediaries, and a stipulation drafted by attorneys of the Defendants' choosing, all backed by the threat that the same court would order Plaintiff's arrest if the price was not paid.

56. Plaintiff agreed to none of the terms.

## F. The Call on the Eve of the Trial

57. On the night of March 10, 2024, shortly before midnight and hours before the custody trial was to begin, Beck telephoned a friend and advisor of Plaintiff (the "Advisor"). Beck introduced herself as Plaintiff's attorney. Beck said that she had met Plaintiff at Gertner's home, that she was looking for Plaintiff, and that she had "a nice deal" that could be worked out.

58. Beck then said that if the deal did not happen, Plaintiff "will be in trouble" and would be held in contempt. When the Advisor asked how that could be when Plaintiff had not been served with any process, Beck insisted that the Advisor tell Plaintiff that "they" were looking for him and wanted to carry out the deal that had been discussed. The Advisor refused.

59. The call was lawfully recorded, and Plaintiff has copies of the recordings.

60. Upon information and belief, Beck's statement that Plaintiff would be held in contempt if the deal was not carried out reflected the understanding between the Defendants and the court described in Parts D and E.

## G. The March 2024 Trials

61. On March 11, 2024, the custody trial went forward before Justice Eisenpress. Plaintiff, who was then without counsel, did not appear.

62. On March 15, 2024, Plaintiff filed a petition under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Pennsylvania, No. 5:24-bk-00632-MJC, which triggered the automatic stay under 11 U.S.C. § 362.

63. On March 20, 2024, notwithstanding the automatic stay, Justice Eisenpress conducted the support trial in Plaintiff's absence.

64. Pearl's counsel told the court that she had not served Plaintiff because he was "in hiding." The court directed the sale of the marital home, imputed annual income of approximately $203,000 to Plaintiff, and awarded Pearl counsel fees.

65. Because the March 20, 2024 proceedings were conducted in violation of the automatic stay, they were later treated as void, and Pearl's counsel requested a new trial.

66. After Justice Eisenpress was transferred out of Rockland County, the Matrimonial Action was reassigned to the Honorable Rachel E. Tanguay.

67. Plaintiff did not appear on the trial date of August 11, 2025, and the court proceeded to an inquest on the financial issues at which only Pearl and her counsel appeared. Plaintiff received no notice of that trial date at his home in Forty Fort, Pennsylvania, where he had lived since 2023.

68. On October 24, 2025, the court issued findings of fact and conclusions of law (NYSCEF Doc. No. 215), and on December 4, 2025, it entered a corrected judgment of divorce on Plaintiff's default (NYSCEF Doc. No. 221). The judgment recites that Plaintiff's address is "Unknown." The same day, Pearl's counsel served notice of entry of the judgment on Plaintiff by FedEx at his Forty Fort address (NYSCEF Doc. No. 222).

69. Plaintiff, through separate counsel, has moved in the state court to vacate that judgment, and that motion is pending.

70. Plaintiff does not ask this Court to review the inquest, the findings, the judgment, or any other order of the state court.

**H. The public record**

71. On January 28, 2026, Justice Eisenpress entered into a stipulation with the New York State Commission on Judicial Conduct under which she agreed to leave the bench effective April 28, 2026 and never to return to judicial office.

72. The Commission's charges, which the stipulation resolved, alleged that Justice Eisenpress had failed to disclose, or to recuse herself from, at least 55 cases between 2019 and 2024 involving attorneys with whom she had close personal relationships, including matrimonial cases.

73. Plaintiff has met with at least one other Rockland County litigant who describes the same method in his own case: a connected intermediary, an attorney chosen by the intermediary, a fee, and a judge who then rules accordingly.

## I. Plaintiff's Injuries

74. As a direct result of the Defendants' conduct, Plaintiff was deprived of a neutral and impartial tribunal in the Matrimonial Action, before which the custody of his children, his support obligations, and the disposition of his home were decided.

75. Plaintiff has suffered economic loss, including legal fees and costs paid and owed to counsel in the Matrimonial Action for proceedings before a tribunal the Defendants claimed to control.

76. Plaintiff has suffered severe emotional distress, fear, and humiliation, including from the Defendants' threats that he would be arrested.

77. The Defendants acted intentionally, maliciously, and with reckless indifference to Plaintiff's rights.

## CAUSE OF ACTION

**Conspiracy to Deprive Plaintiff of Due Process of Law — 42 U.S.C. § 1983**
**(Against All Defendants)**

78. Plaintiff repeats each of the preceding allegations of this Complaint.

79. The Due Process Clause of the Fourteenth Amendment guarantees Plaintiff that the State of New York will not deprive him of liberty or property without due process of law. Due process requires, at a minimum, a neutral and impartial tribunal and a meaningful opportunity to be heard before the state decides the custody of his children, his obligation to pay support, and the disposition of his property.

80. Justice Eisenpress, in presiding over the Matrimonial Action, acted under color of state law.

81. Upon information and belief, the Defendants, who are private persons, reached an understanding with Justice Eisenpress, directly or through intermediaries, that the Matrimonial Action would be decided against Plaintiff and in accordance with terms the Defendants dictated, in exchange for money. By willfully joining in that understanding with a state officer, the Defendants acted under color of state law.

82. In furtherance of that understanding, the Defendants committed overt acts, including: Gertner's recruitment of Plaintiff and his introduction of Plaintiff to Silberberg; Silberberg's insistence that Plaintiff retain one of three attorneys of his choosing; Kahan's statements, relayed through Silberberg, that he controlled the case; the demand that $50,000 be paid to Silberberg; the meetings at which a cash payment for Justice Eisenpress was made a condition of ending the case; and the repeated threats that Plaintiff would be arrested.

83. As a direct and proximate result, Plaintiff was deprived of a neutral and impartial tribunal and suffered the injuries described in Part I.

84. The Defendants acted with malice and with reckless indifference to Plaintiff's federally protected rights. Plaintiff is entitled to compensatory and punitive damages and to his reasonable attorneys' fees under 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for a Judgment against the Defendants, jointly and severally, as follows:

(i.) compensatory damages in an amount to be determined at trial;
(ii.) punitive damages in an amount to be determined at trial;
(iii.) reasonable attorneys' fees under 42 U.S.C. § 1988;
(iv.) pre-judgment and post-judgment interest;
(v.) the costs and disbursements of this action; and
(vi.) such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable.

DATED: October 23, 2026

RESPECTFULLY SUBMITTED,

By:______________________

Baruch S. Gottesman, Esq.
GOTTESMAN LEGAL PLLC
11 Broadway, Suite 615
New York, NY 10004
Phone: (212) 401-6910
bg@gottesmanlegal.com
*Counsel for Plaintiff Shmuel M. Goldenberg*